No. 46,182

H & R Block, Inc., *Appellant*, v. Earl Lovelace, *Appellee.*

(493 P. 2d 205)

Opinion filed January 22, 1972.

*James M. Immel,* of Immel and Immel of Iola, argued the cause and was on the briefs for the appellant.

*J. D. Conderman,* of Conderman and Talkington, of Iola, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is an appeal by a plaintiff franchisor in an action brought by it to restrain an individual franchise from violating a covenant not to compete in the business of preparation of tax returns upon termination of the franchise. The issue here is the validity of the restrictive covenant.

The action was submitted to the trial court for determination upon undisputed facts which may be summarized as follows:

Plaintiff H & R Block, Inc. is a corporation engaged in franchising individuals and other concerns to operate a business solely for the preparation of income tax returns and services incident thereto under the name of H & R Block.

On or before January 1, 1961, plaintiff and defendant Earl Lovelace entered into the following written agreement:

"AGREEMENT, made and entered into this _____ day of _____, 19_____ between H & R BLOCK, INC., a _____ corporation, First Party, and EARL LOVELACE, 600 East Madison of Yates Center, Kansas, Second Party:

"WHEREAS, First Party is engaged in the business of franchising individuals and concerns to operate a service dealing exclusively with the preparation of tax returns; and

"WHEREAS, Second Party desires to operate such a service;

"Now, THEREFORE, BE IT AGREED:

"1. *First Party agrees:*

"a. To franchise Second Party to operate a business solely concerned with the preparation of tax returns, to be located within 5 miles of *Yates Center, Kansas.*

"b. To refrain from competing with Second Party during the term of this Agreement within said 5 mile area.

"c. To permit Second Party to operate under the name of H & R BLOCK, and since First Party desires to increase the prestige and prominence of such name on a national basis, the use of any other name in connection with the preparation of tax returns, by Second Party is expressly prohibited.

"d. To explain fully and to instruct Second Party in the operational details of the business, in consideration wherefor Second Party agrees to spend three (3) days in Kansas City, Missouri in November.

"e. To advise Second Party in the selection and location of an office or offices.

"f. To furnish Second Party with information necessary to establish an operating budget.

"g. To design forms to be used in the preparation of tax returns and advise as to quantities needed.

"h. To furnish Second Party with all specialized forms and equipment (not required by the normal accounting business) deemed necessary by the First Party for the Second Party to efficiently operate the business. Any equipment or supplies will be furnished F. O. B. point of origin and installed and maintained in good working condition by Second Party.

Should this contract be terminated, any equipment or remaining supplies will be returned to the First Party in good condition.

"i. To train employees of Second Party in the matter of preparing returns, customer relations and H & R BLOCK procedures, provided that such training shall take place in Kansas City, Missouri only, at a time designated by First Party.

"j. To furnish and pay for all promotion and advertising deemed advisable by First Party.

"k. To assist Second Party in any tax and management problems which may arise during the period of this Agreement.

"2. *Second Party agrees:*

"a. To operate under this Agreement a tax return business under the name of H & R BLOCK.

"b. To prepare quality returns accurate to the best of Second Party's knowledge and to be checked thoroughly before they shall be returned to clients.

"c. To maintain office hours from 9 A. M. to 6 P. M. during weekdays and Saturdays during the tax season, to wit: at least the first Sunday after January 1st through April 15th, Second Party's office or offices to be neat and orderly at all times and with sufficient personnel to promptly accommodate all clients.

"d. To furnish sufficient time to supervise properly and efficiently the operations of the business.

"e. To furnish duplicate copies of receipts of all funds of every kind and character received by Second Party, such copies to be sent to First Party semi-weekly together with re-cap sheets, with further provision that Second Party's books and records shall be open to inspection by First Party at all times.

"f. To adhere to the basic schedule of charges of First Party.

"g. To attend our employee training in Kansas City during January in the first year of this agreement.

"3. In consideration of the foregoing, Second Party agrees to pay First Party a sum equal to 60% of the gross receipts received by Second Party. Reports of such receipts through the 15th and last day of each month shall be submitted to First Party within 5 days after the end of such respective periods. Payment shall be due within 30 days after each report period.

"a. If payment, however, is made within 5 days after a report period, a discount of 10 percentage points from established rate shall be allowed. For example, for the first half of January of the first year, if payment is remitted by January 20th, only 50% is due. Otherwise 60% must be paid by February 15th.

"b. Attached hereto is a list of prior clients whose tax returns were prepared by Second Party. Any money received from a listed client shall be deducted from the applicable report before multiplying by the appropriate percentage.

"4. Both parties agree to perform this Agreement faithfully at all times. If Second Party, however, shall breach any provision herein in any respect, this Agreement shall be automatically terminated and, in addition to any other

amount which Second Party shall owe to First Party, Second Party shall pay to First Party the sum of $1,000.00 as liquidated damages. Furthermore if Second Party shall sell, assign, transfer, terminate or breach the contract he shall not enter into competition directly or indirectly with First Party for a period of five (5) years thereafter. Title to all books, records, files and lists of clients of Second Party shall remain in him, provided however, that if he shall breach the contract, such title shall be forfeited and shall vest in First Party, who shall also be entitled to possession of such books, records, etc.

"5. The term of the Agreement shall be for a period of four (4) years from the date hereof, with further provision that it shall be automatically renewed for successive periods of one (1) year each unless cancelled by serving written notice so to cancel on the other party no less than 120 days prior to an anniversary date."

Pursuant to this agreement, on January 1, 1961, defendant commenced the operation of a tax return business in Yates Center under the name H & R Block, which he continued to operate during the income tax seasons of 1961 through 1968.

On October 29, 1968, defendant gave plaintiff notice of his intent to terminate the contract and on January 1, 1969, he commenced an income tax preparation business under his own name at the same location in Yates Center at which he had conducted business under the Block name and he has continued to operate an office at that location in competition with plaintiff since that time.

On March 17, 1969, plaintiff commenced this action by the filing of its petition in which it sought damages for breach of contract and an order restraining defendant "from competing with the plaintiff for a period of five (5) years from the termination of said contract as provided by the aforesaid agreement."

Thereafter defendant answered, alleging among other defenses that the purported restriction of competition contained in paragraph 4 of the franchise agreement was an unreasonable restraint of trade and contrary to public policy. At a pretrial conference issues were defined and the trial court made the following ruling:

"I do not find that the defense of the ultra vires act is good. I think this is not such a skilled profession as would be prohibited by our law, and taking judicial notice of the number of people that are practicing preparation around.

"I feel that the contract contemplates throughout that the restriction upon Lovelace for his activity subsequent to the termination of it, is the five mile radius surrounding Yates Center, and this is the only area in which it could have any effect.

"I am also taking notice of the fact that there are one or two other tax services over there that I have noticed, which are not Block, and are not Lovelace, so I think this service is open to the public, and I think in view of

these findings, I cannot sustain the motion either on the basis that it is suppressive, unconscionable and burdensome, or impossible performance."

On February 27, 1970, the case having been submitted for determination upon the pleadings and certain stipulations made at pretrial conference, the court rendered its final decision as follows:

"The contract in essence permits the defendant to operate a business concerned with the preparation of tax returns to be located within five miles of Yates Center, Kansas. The plaintiff agrees to refrain from competing within the five mile area during the term of the agreement, and the defendant is permitted to operate under the name of the plaintiff. In addition, the plaintiff obligated itself to instruct the defendant in the operational details of the business, advise as to preparation of returns, to train employees of the defendant in preparation of returns, to promote and advertise as it might deem advisable and to assist the defendant in tax and management problems. The defendant agreed to operate a tax return business under the plaintiff's name, to prepare quality returns accurately, and among other things to adhere to the basic schedule of charges of the first party. Certain provisions were devoted to the manner in which the second party was to pay the first party for what essentially is the use of its name and such professional help as the first party could give to the second party. Paragraph 4 of the agreement provided for faithful performance and the effect of a breach of the agreement on the part of the second party-defendant. Paragraph 5 of the agreement sets forth that the term thereof was to be four years from its date and that it was automatically renewed for successive periods of one year each unless cancelled by the service of written notice on the other party no less than one hundred twenty days prior to the end of a term.

"As previously noted, there is no provision in the contract with respect to any obligations on the part of H & R Block in the event it should have breached the contract. Paragraph 4 refers only to the obligations of the defendant in the event of his breach.

"That defendant has breached the agreement by terminating it not in conformity with paragraph 5 thereof, seems implicit from the pleadings on both sides. Thus, for determination are the rights of the parties under paragraph 4.

"At the last conference I indicated I felt that the restriction on the defendant from entering into competition directly or indirectly with the plaintiff for a period of five years after the breach of the contract meant that he could not engage in the tax return preparation business in an area within five miles of Yates Center for such period. I have concluded that this view is incorrect and the proper interpretation of this provision of the contract is that the defendant is precluded from practicing such business anywhere for a period of five years.

"Further, I conclude that no sale or other transfer of business occurred at the incidence of the contract or upon its breach by the defendant. The covenant against competition, is therefore, in the nature of a penalty. It should be added that defendant had no corresponding protection against plaintiff in the event of plaintiff's breach. The covenant against competition is unenforceable. Tong v. McArthur, 121 Kan. 820.

"If it can be rationalized that a sale or transfer of a business took place at the execution of the instant agreement and further that the agreement was in the nature of a partnership arrangement with a covenant against competition upon the partnership dissolution or the agreement was in the nature of an employment contract with the defendant agreeing not to compete upon his ceasing such employment, then I believe the contract is not enforceable because it is unreasonable as to time. The test as to time is reasonableness as to the covenanter, as to the covenantee and as to the general public. See annotation at 45 A. L. R. 2d 77. Without any evidence whatever it seems that a five year period goes far beyond what Block needs timewise to protect its name and business against this defendant, particularly if the protection is beyond the environs of Yates Center, and to keep Lovelace from practicing this business for five years seems far beyond the pale of reasonableness in such a calling as tax return preparation.

"The territorial restraint which, I believe, actually extends to the world, or, at least wherever Block is now or may during the five year period commence doing business, is per se unreasonable. See the extensive annotation on covenants as to competition-area, which appears in 46 A. L. R. 2d 119.

"It appears, therefore, that the plaintiff is entitled to judgment for $1,000.00, same being the liquidated damages agreed to by the parties in the event of a breach by the second party; that the injunction sought by the plaintiff should not issue. It does appear, however, that the defendant should be restrained from any further identification with the plaintiff in the practice of his business, which is to say, he should not advertise in any manner which indicates that he once was associated with the plaintiff, nor use signs or other identification which would tend to associate him with the plaintiff in the eyes of the undiscerning public."

Judgment was entered in accord with the foregoing memorandum. Plaintiff has now appealed from that part of the judgment which denied its request for injunctive relief restraining defendant from competing with plaintiff in the business of income tax return preparation.

Plaintiff contends the trial court erred in finding that the covenant against competition extended to the world and precluded defendant from carrying on an income tax business anywhere and in holding accordingly that it was unenforceable, and further that the court erred in finding the covenant unreasonable as to time and unenforceable for that reason.

This court has dealt many times with the law governing non-competition clauses in agreements of various types (see 2 Hatcher's Kansas Digest, rev. ed., Contracts, §§ 52, 58; 3A West's Kansas Digest, Contracts, §§ 115-117). Most often the agreements have been incident to the sale or transfer of a business; however, the rule is well established that such a clause is good if it is ancillary

to any lawful contract (*John Lucas & Co. v. Evans,* 141 Kan. 57, 40 P. 2d 359), subject, of course, to the test of reasonableness of the covenant and whether it is inimical to the public welfare (*Mills v. Cleveland,* 87 Kan. 549, 125 Pac. 58).

Although there is no rigid, absolute norm by which the reasonableness of a covenant against competition may be determined, rules evolving generally from this line of decisions are to the effect that the rights of the promisee, the promisor and the general public are to be taken into account; area and time limitations must be reasonable under the facts and circumstances of the particular case (*Heckard v. Park,* 164 Kan. 216, 188 P. 2d 926, 175 A. L. R. 605). It is readily apparent the governing rules are equitable in nature as they must be where courts are called upon to resolve conflicts between basic principles of law, the conflicting rules here being (1) under the common law agreements in restraint of a person's right to exercise his trade or calling were void as against public policy (54 Am. Jur. 2d, Monopolies, etc., § 511) and (2) contracts of persons *sui generis* are to be enforced.

In determining the question of reasonableness a distinction has sometimes been made between covenants incident to an employment contract and those ancillary to a sale or other transfer of a business, practice or property. Where distinctions have been made courts of equity have been less prone to enforce restrictive covenants between employer and employee than where the restriction is part of a contract for sale of a business in which good will may be a part of the property sold, and such courts have construed the former more strictly against the employer-promisee in determining their reasonableness (for comprehensive analysis and summary on this aspect and on the subject of covenants against competition generally, see 41 A. L. R. 2d 15, 20-33; 43 A. L. R. 2d 94, 109-115; 45 A. L. R. 2d 77, 96-98; 46 A. L. R. 2d 119, 142-146).

Reasons given for distinctions made between employer-employee and sale covenants are trenchantly stated in *Arthur Murray Dance Studios of Cleveland v. Witter,* 105 N. E. 2d 685, (CP, Ohio, 1952) as follows:

". . . the snow-balling weight of authority in England and the United States recognizes a distinction. In contrasting the employee covenant with the sale covenant, some of the typical pronouncements are—the employee covenant is more critically examined, more strictly construed—it is construed favorably to the employee—it is viewed with askance and more jealously—it is not viewed as liberally or with the same indulgence—it is looked upon with less favor,

more disfavor—courts are more loathe, less disposed and more reluctant to sustain or enforce it—not identical tests but different considerations apply—there is more freedom of contract between seller and buyer than between employer and employee,—the latitude of permissible restraint is more limited between employer and employee, greater between seller and buyer. The following are some of the reasons given for making the above distinction. The average, individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses. His individual bargaining power is seldom equal to that of his employer. Moreover, an employee ordinarily is not on the same plane with the seller of an established business. He is more apt than the seller to be coerced into an oppressive agreement. Under pressure of need and with little opportunity for choice, he is more likely than the seller to make a rash, improvident promise that, for the sake of present gain, may tend to impair his power to earn a living, impoverish him, render him a public charge or deprive the community of his skill and training. The seller has the proceeds of sale on which to live during his period of readjustment. A seller is usually paid an increased price for agreeing to a period of abstention. The abstention is a part of the thing sold and is often absolutely necessary in order to secure to the buyer the things he has bought. Usually the employee gets no increased compensation for agreeing to the abstention; it is usually based on no other consideration than the employment itself." (pp. 703-704.)

We think the sounder line of reasoning, as well as the weight of authority elsewhere, supports the view such distinction should be made.

The agreement before us is neither a contract of employment nor one for sale of a business, but rather that which in the modern business world has now come to be known as a franchise. In its simplest terms a franchise is a license from the owner of a trademark or trade name permitting another to sell a product or service under that name or mark. More broadly stated, the franchise has evolved into an elaborate agreement under which the franchisee undertakes to conduct a business or sell a product or service in accordance with methods and procedures prescribed by the franchisor and the franchisor undertakes to assist the franchisee through advertising, promotion and other advisory services. The franchise may encompass an exclusive right to sell the product in a specified territory (see 15 Business Organizations, Glickman, Franchising, § 2.01).

For our purpose here it is not necessary to categorize the franchise nor to distinguish it from other relationships, such as employee vis-a-vis independent contractor or the like, and we

would not be heard to do so. Suffice it to say under the contract here defendant operated under plaintiff's name in providing a service in which enterprise plaintiff retained a considerable amount of operational control including the prescribing of office hours, fees to be charged, methods and forms to be used, accounting periods, advertising and promotion and training of personnel, and upon breach of the contract by defendant, title to and possession of books, records, files and client lists vested in plaintiff.

Under these narrow facts we are inclined to the view the contract is more akin to one of employment than to a contract for sale or disposition of a business and sufficiently of that character to make strict construction against the promisee appropriate.

In the light of the foregoing principle we turn to the question of the territorial extent of the restriction contained in the contract. The trial court determined it to be without limitation. Plaintiff urges that, construing the entire agreement from its four corners, the covenant contained in paragraph 4 was intended only to prohibit competition by defendant within five miles of Yates Center—a reasonable limitation which should now be imposed on defendant. The difficulty is, paragraph 4 does not so state—rather it contains no limitation of any kind. That the parties knew how to fix specifically a territorial limitation is demonstrated by the fact subparagraphs a and b of paragraph 1 of the agreement do exactly that in prescribing a location for the franchised operation and in specifying an area in which *plaintiff* would not compete. Had it been the intention of the parties, and particularly the plaintiff (presumably the draftsman for the agreement), to limit the extent of the restrictive covenant as to *defendant's* competition it would have been simple so to state as was done in paragraph 1.

Plaintiff calls attention to the case of *Foltz v. Struxness*, 168 Kan. 714, 215 P. 2d 133, in which a territorial limitation of one hundred miles from the city of Hutchinson, contained in a covenant not to compete, was reduced by the trial court to a radius of five miles from the city and enforced, which action was upheld by this court. Reliance upon this decision is misplaced in that the facts as well as the posture of the ruling upon appeal are distinguishable from those at bar. There the contract was between an older doctor with an established medical practice in the city of Hutchinson and a young doctor seeking a location. The contract of employment was for a period of one year, at the end of which

a partnership was to be negotiated to carry on the practice, the terms of which were left subject to further mutual agreement. Both parties were found by the trial court to have acted in good faith in attempting, albeit unsuccessfully, to negotiate that partnership agreement. Clearly the contract contemplated a transfer of a proprietary interest in an established practice. Moreover, the trial court there, applying equitable doctrine, reduced the territorial limitation under the particular facts of the case. The trial court here did not do so and we are not under the circumstances inclined to write a new contract for the parties.

We think the trial court correctly construed the contract as one intended to prohibit competition by defendant anywhere, and, accordingly, properly declined to enforce it because of unreasonableness as to territorial extent.

The enterprise was for a service activity of a local nature, that is, one generally sought and obtained by the customer locally. Unlimited territorial restriction was unnecessary and unjustifiable for plaintiff's protection and therefore unreasonable.

Once it is determined the covenant was unenforceable because of the extent of the territorial restriction, consideration of other matters raised becomes unnecessary.

The judgment is affirmed.

APPROVED BY THE COURT.

FONTRON, J., dissenting: I cannot agree with the action of my colleagues in striking down, as unenforceable, the covenant not to compete which was a component part of the agreement under which the parties lived for some eight years, presumably to their mutual benefit and profit. The court's opinion is premised on the proposition that the covenant not to compete is unrestricted as to area and that it was intended to prevent competition anywhere —or in the words of the trial court, whose decision is being upheld, "the territorial restraint  .  .  .  actually extends to the world."

Such an interpretation strikes me as unreasonable and even a bit absurd, considering all the contract provisions. I understand the rule of construction to be, as often declared by this court, that a contract must be interpreted in a reasonable manner in the light of all its terms, its intended purpose and the circumstances attendant upon its making. This principle is well expressed in *Weiner v. Wilshire Oil Co.,* 192 Kan. 490, 496, 389 P. 2d 803:

"In placing a construction on a written instrument reasonable rather than unreasonable interpretations are favored by the law. Results which vitiate the purpose or reduce the terms of the contract to an absurdity should be avoided. The meaning of a contract should always be ascertained by a consideration of all the pertinent provisions and never be determined by critical analysis of a single or isolated provision. (*Tate v. Stanolind Oil & Gas Co.*, 172 Kan. 351, 240 P. 2d 465; *Brooks v. Mull*, 147 Kan. 740, 78 P. 2d 879; and *Heckard v. Park*, 164 Kan. 216, 188 P. 2d 926. It is not the province of the court to make contracts for the parties. Its function is confined to an interpretation of the contract which the parties have entered into. Every presumption is in favor of the legality of a contract rather than its illegality. (*Mosher v. Kansas Coop. Wheat Mkt. Ass'n*, 136 Kan. 269, 15 P. 2d 421; and *Geier v. Eagle-Cherokee Coal Mining Co.*, 181 Kan. 567, 313 P. 2d 731.)

"Prior to a resort to extrinsic evidence, the instrument is to be interpreted from its 'four corners.' That is to say, all the language used anywhere in the instrument should be taken into consideration and construed in harmony with other portions of the instrument. (*Skelly Oil Co. v. Cities Service Oil Co.*, 160 Kan. 226, 231, 160 P. 2d 246; *Heckard v. Park*, supra, and *Smith v. Russ*, 184 Kan. 773, 339 P. 2d 286.)"

(See, also, 2 Hatcher's Kansas Digest [Rev. Ed.] Contracts, § 52, 58 and 3A West's Kansas Digest, Contracts, § 115, 117.)

The general rules of interpretation outlined in *Weiner* have been applied by this court in the construction of contracts involving restrictive covenants. In *Heckard v. Park*, 164 Kan. 216, 188 P. 2d 926, the plaintiff, who had been employed to teach and train a young musician, sued for specific enforcement of a written agreement containing certain restrictive covenants breached by the youthful artist. In an opinion upholding the contract as valid, this court said:

". . . Reasonable rather than unreasonable interpretations are favored by the law. (*Southwest Kan. Oil & G. Co. v. Argus P. L. Co.*, 141 Kan. 287, 292, 39 P. 2d 906; *Brooks v. Mull*, 147 Kan. 740, 747, 78 P. 2d 879.) . . . In *Federal Land Bank v. Girtch*, 151 Kan. 528, 99 P. 2d 768, the general and long established rule was followed and stated thus:

" 'Where ambiguity or uncertainty is involved, the intention is not ascertained from punctuation alone or by resort to literal interpretation, but by considering all language employed, circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties.' (Syl. ¶ 2.)" (p. 219.)

In *Foltz v. Struxness*, 168 Kan. 714, 215 P. 2d 133, a case arising over a restrictive covenant in a contract between two doctors, the following pronouncement of the law is found.

"It is the duty of courts to sustain the legality of contracts in whole or in part when fairly entered into, when reasonably possible to do so, rather than

to seek loopholes and technical legal grounds for defeating their intended purpose." (Syl. ¶ 5.)

Applying the basic tests of construction to the instant contract, I find myself baffled by the interpretation given it by a majority of the members of this court. It seems perfectly clear to me that the purpose of the restriction is to protect the plaintiff franchisor from competition by the defendant franchisee for a period of 5 years. A covenant against competition is, in my view, a legitimate subject for contract in a situation of this kind. Such was the decision in *Shakey's Incorporated v. Martin*, 91 Idaho 758, 430 P. 2d 504, where the Idaho court held in effect that a franchisor, in selling its franchises, has a legitimate business interest which is protectable by a covenant not to compete.

In all frankness, what would be the area in which plaintiff's interest might require protection in this case? I can only conclude that the area of protection was intended by the parties to be that area in which the defendant was franchised to operate an income tax service under the plaintiff's name and according to its system. By the express terms of the franchise the tax return business was to be conducted by defendant within a distance of 5 miles from Yates Center, not at some distant spot of this teeming world. Added weight is given this view by the provisions of paragraph 1b wherein the franchisor agrees to refrain from competing with the franchisee "within said 5 mile area" during the term covered by the agreement.

To repeat—I believe that a fair and reasonable construction of the restriction set forth in the contract between these parties is that Mr. Lovelace, the defendant, is not to compete with H & R Block, Inc. within a five-mile area radiating from Yates Center. Any other construction would, to me, appear irrational.

There is no claim by defendant that he was forced into making the agreement, nor is there any indication of coercion on the part of plaintiff. The defendant appears to be possessed of normal, if not superior, intelligence (being an accountant and tax consultant) and fully capable of entering into his own contracts with understanding and comprehension. He should be required to respect and to carry out a voluntary agreement.

In its opinion, this court seems to emphasize the similarity between contracts of franchise and contracts of employment. The resemblance seems somewhat exaggerated. Although in some re-

spects the two may be comparable, a contract granting a franchise is much more analogous to a contract for sale of a business than it is to an employment contract. The analogy between contracts of sale and contracts of franchise is implicit in the Idaho court's decision in *Shakey's Incorporated v. Martin,* supra.

However, the resemblance between contracts for the sale of a business and contracts which grant a franchise is not basic to the views expressed in this dissent, for the Kansas court has upheld restrictive covenants in contracts of employment (*Heckard v. Park,* supra; *Foltz v. Struxness,* supra) as well as contracts of sale. (*Mills v. Cleveland,* 87 Kan. 549, 125 Pac. 58; *Pohlman v. Dawson,* 63 Kan. 471, 65 Pac. 689.) So long as the restraint is reasonable and not offensive to the public interest, the same tests are to be applied in either case. In the *Heckard* case we held:

"The old rule as to limitations of time and space with respect to contracts involving restraint of trade has given way to the modern doctrine of reasonableness, and the real test is never whether there is any restraint but always whether the restraint is reasonable under the facts and circumstances of the particular case." (Syl. ¶ 7.)

This rule was reiterated in the *Struxness* decision.

The trial court found that the territorial limitation, which it construed as being world-wide, was unreasonably broad and this court has concurred in that view. I would concede that a restriction against competition anywhere in the world might well be unreasonable under the facts of this case. But a 5-mile limitation is an entirely different matter. In *Struxness* the trial court reduced the area limitation from a distance of 100 miles from the city of Hutchinson to a distance of 5 miles therefrom, and the court was upheld. In *Wilson v. Gamble, et al.,* 180 Miss. 499, 177 So. 363, cited in the *Struxness* opinion, the contract of an assistant physician not to engage in practice within 5 miles of a city was held to be valid. Cases relating to the reasonableness of area limitation in covenants not to compete are collated in 46 A. L. R. 2d Anno: Sale—Covenant As To Competition—Area, pp. 119-396. A good many authorities holding a 5-mile restraint to be reasonable are listed in § 179 at pp. 361, 362, while none of a contrary view appear. A 5-mile limitation appears entirely reasonable in this case and since no claim is made that public policy is violated, the rule expressed in *Foltz v. Struxness,* supra, is particularly apt:

"Although restrictive provisions in contracts of employment must be reasonable and not such as to contravene the public welfare, the paramount public

policy is that freedom to contract is not to be interfered with lightly." (Syl. ¶ 6.)

It should further be pointed out that *Foltz v. Struxness,* supra, stands for the proposition that where a territorial restriction is more extensive than required to provide reasonable protection against encroachment, a court of equity is empowered to reduce the territory to the extent reasonably necessary to insure the contemplated protection and to enforce the contract to such extent. This ruling finds substantial support among the authorities and in my judgment should have been followed by the trial court in this case.

The majority opinion does not note the trial court's conclusion that the time limitation of 5 years was also unreasonable. This finding was arrived at, by the court's own statement, "Without any evidence whatever." I believe the court was mistaken in finding as a matter of law that the time limit was unreasonable. The law in this regard is seen reflected by the statement found in 45 A. L. R. 2d Anno: Sale—Covenant As To Competition—Time, § 11, p. 115:

"Where the duration of the restraint is limited as to time, the mere length of the period of time during which the restraint is to operate, standing alone, is never sufficient to render the restrictive covenant not to compete ipso facto unenforceable. This proposition is so well settled that no case has been found that would even intimate a contrary viewpoint."

See, also, *Heckard v. Park,* supra, where the contract in issue covered a period of seven years.

For reasons disclosed above I must, with due respect, dissent. I would reverse the judgment of the court below.

KAUL, J., joins in the foregoing dissenting opinion.

OWSLEY, J., dissenting: In my opinion, the construction of the contract in the majority opinion is erroneous. It appears clear to me that the restrictive covenant prohibiting competition is limited to an area within five miles of Yates Center, Kansas, and for a period of five years.

I dissent on the ground the restriction against competing with plaintiff for a period of five years is unreasonable. The purpose of the restriction is to prevent defendant from acquiring the customers served by H & R Block, Inc. This could be done effectively by preventing the defendant from competing with plaintiff in the preparation of income tax returns for a period of one year. A pro-

hibition beyond one year would result in a hardship on defendant not justified by the advantage to plaintiff.

Exercising our equitable powers, I would modify this contract to limit the time of restraint to one year and then enforce the contract as written.